J-A11008-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Y.W.-J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2580 EDA 2021 |

Appeal from the Order Entered November 16, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001875-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: H.T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Y.W.-J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2581 EDA 2021 |

Appeal from the Decree Entered November 16, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000303-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Y.W.-J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2582 EDA 2021 |

Appeal from the Order Entered November 16, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001874-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: T.A.W., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: Y.W.-J., MOTHER | : : : : : : : | |
| | : | No. 2583 EDA 2021 |

Appeal from the Decree Entered November 16, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000302-2020

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J. :                                    **FILED JULY 15, 2022**

In these consolidated cases, Y.W.-J. ("Mother") appeals from the November 16, 2021 decrees involuntarily terminating her parental rights to T.W., also known as T.A.W., born in March 2017, and H.W., also known as H.T.W., born in July 2018.  Mother also appeals from the November 16, 2021 orders in the dependency cases of T.W. and H.W., which changed their permanency goals from reunification to adoption.  We affirm the termination decrees and the goal change orders.

We begin with an overview of the relevant facts and procedural history. Philadelphia Department of Human Services ("DHS") became involved with the family following H.W.'s birth when H.W. and Mother tested positive for marijuana.  N.T., 11/16/18, at 12-13.  DHS provided services to the family through a Community Umbrella Agency ("CUA").  DHS had concerns about

- 2 -

Mother's mental health because she displayed aggressive behaviors and outbursts of anger and appeared to be "mentally unstable." *Id*. at 24.

After several months of involvement with the family, DHS filed a petition to adjudicate T.W., H.W., and their older half-sibling, E.W. ("Sibling")[1] dependent pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6301 – 6375. On September 19, 2018, the trial court adjudicated Sibling, T.W., and H.W. dependent, but permitted Sibling, T.W., and H.W. to remain in Mother's legal and physical custody under DHS supervision. N.T., 11/16/21, at 13; *see also* Order of Adjudication and Disposition, 9/19/2018, at 1-2. The trial court ordered Mother to undergo drug screens and a dual diagnosis (*i.e.*, mental health and substance abuse) assessment. The trial court also ordered DHS to refer Mother to domestic violence, parenting, and housing programs.

DHS continued to have concerns about the family's instability. Mother and T.W., the father of T.W. and H.W. ("Father"), were in a relationship, but there was "a lot of domestic violence between [M]other and [F]ather." *Id*. at 15. Mother and Father refused to acknowledge the domestic violence despite getting into altercations outside the courtroom after hearings. *Id*. Sibling was truant to school. *Id*. at 14. H.W., the infant, was diagnosed with sickle cell disease. *Id*. DHS received reports that the family was staying in different locations, and there were times Mother refused to allow DHS into the homes

---

[1] Sibling was born in March 2011. He is not involved in this appeal.

where she claimed to be staying. *Id*. at 22, 24. Mother did not attend two dual diagnosis assessment appointments she scheduled, and she tested positive for cannabis twice. N.T., 9/16/21, at DHS Exhibit 3.

At the December 3, 2018 permanency review hearing in T.W.'s and H.W.'s dependency matters, DHS informed the trial court that Mother had absconded to Syracuse, New York with Sibling, T.W., and H.W. *Id*. at 22-23. The trial court ordered DHS to locate the children and obtain orders of protective custody. *See id*. at DHS Exhibits 5-7. DHS did so, and the trial court entered orders of protective custody on December 9, 2018. *Id*. at 23-24. With the assistance of a child welfare agency in New York, DHS retrieved Sibling, T.W., and H.W., and DHS placed them into foster care in Pennsylvania. *Id*. at 23. Originally, DHS placed T.W. and H.W. into different foster homes, but in November 2019, T.W. moved into H.W.'s foster home. *Id*. at 124, 145.

Over the course of T.W. and H.W.'s dependency cases, the trial court reviewed their permanency plan at twelve permanency review hearings. At some point that is unclear from the certified record, the trial court returned Sibling to Mother's custody. At the June 8, 2020 hearing, the trial court found Mother to be in substantial compliance with the permanency plan. Permanency Review Orders, 6/8/20, at 2. The court permitted expansion of her visits and to transition T.W. and H.W. towards reunification upon agreement of the parties, but only after Sibling had been returned for at least

thirty days, and upon the condition that Mother continue with intensive outpatient treatment. *Id*.

However, reunification of Mother, T.W., and H.W. did not occur. On September 8, 2020, DHS filed petitions to terminate involuntarily Mother's parental rights to T.W. and H.W. pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b).[2] It also filed petitions to change the permanency goal for T.W. and H.W. from reunification to adoption.

The trial court conducted a joint hearing on DHS's petitions on November 16, 2021. At the time of the hearing, T.W. was age four and H.W. was age three. Shannon Sherwood, Esquire, represented T.W. and H.W. as guardian *ad litem*. Meredith Rogers, Esquire, represented T.W. and H.W. as legal counsel. Mother was represented by court-appointed counsel, Frances Odza, Esquire.

DHS presented the testimony of James Allen, the family's assigned CUA case manager. DHS also entered 27 exhibits without objection, including, *inter alia*, a 2020 parental capacity evaluation and 2019 psychological evaluation of Mother, letters from various service providers, and drug screen results. N.T., 11/16/21, at 8. Mother then testified on her own behalf. At

---

[2] DHS's petitions also sought to terminate involuntarily the parental rights of Father. The trial court conducted a hearing on the petitions regarding Father at the same hearing as the petitions regarding Mother. The court granted the petitions as to Father. Father filed his own appeal, which is listed consecutive to this appeal before this panel at 2628 EDA 2021 and 2629 EDA 2021.

the close of all testimony, the trial court denied the termination of parental rights petition under § 2511(a)(1), but granted it under § 2511(a)(2), (a)(5), (a)(8), and (b). It entered decrees on the same day involuntarily terminating Mother's parental rights. It also entered orders in the dependency matters changing the permanency goal to adoption.

Mother timely filed the instant notices of appeal from the termination decrees and goal change orders concurrently with concise statements of matters complained of on appeal. In lieu of an opinion pursuant to Pa.R.A.P. 1925(a), the trial court directed this Court to its rationale for its decision articulated on the record at the close of the November 16, 2021 hearing.

Mother raises the following issues on appeal:

1. Whether [DHS] failed to prove by clear and convincing evidence that Mother's parental rights should have been terminated pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), and (8).

2. Whether [DHS] failed to prove by clear and convincing evidence that the permanency goal should be changed to adoption where Mother had substantially completed and complied with her single case plan objectives.

Mother's brief at 4 (unnecessary capitalization omitted).[3]

In reviewing Mother's appeals from the decrees terminating her parental rights, we bear in mind the following well-settled standard of review. "In

---

[3] The guardian *ad litem* filed a brief supporting the trial court's determinations. We note with disapproval, however, that Attorney Rogers, the children's appointed legal counsel, neglected to file a brief in this appeal.

cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, *supra* at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, *supra* at 358.

- 7 -

Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.*, *supra* at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, *supra* at 359 (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *C.M.*, *supra* at 359; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under subsection 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa.Super. 2021). If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Mother's first issue raises a challenge to the sufficiency of the evidence providing grounds to terminate her parental rights under § 2511(a). This Court need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights. *See In re*

***B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze

Mother's first issue under § 2511(a)(2), which provides as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>>
>> . . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To prove the existence of grounds pursuant to § 2511(a)(2) by clear

and convincing evidence,

> the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the

incapacity, abuse, neglect or refusal cannot or will not be remedied.

***Interest of D.R.-W.***, 227 A.3d 905, 912-13 (Pa.Super. 2020) (citation omitted).

Subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." ***In re Z.P.***, ***supra*** at 1117. "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." ***In re Adoption of A.H.***, 247 A.3d 439, 443 (Pa.Super. 2021). Grounds for termination under § 2511(a)(2) include more than affirmative misconduct and acts of refusal; it also includes parental incapacity. ***Id***. Thus, sincere efforts to perform parental duties may be insufficient to remedy an incapacity. ***In re Z.P.***, ***supra*** at 1117.

In a jumbled argument intermixing the subsections, Mother argues that DHS failed to meet its burden in establishing grounds to terminate her parental rights. ***See*** Mother's brief at 13-16. In support of this argument, Mother asserts that she engaged in mental health counseling, anger management counseling, domestic violence counseling, and parenting classes. ***Id***. at 14. She notes that she obtained employment - albeit until she was laid off during the pandemic – and that she had acquired appropriate housing. ***Id***. She maintains she has provided good care for H.W. by taking

classes to learn about H.W.'s sickle cell disease, attending appointments, and sitting by H.W.'s bedside after she recuperated from surgery to remove her spleen and adenoids. *Id*. In her view, she is capable of parenting, noting the positive interactions with T.W. and H.W. at visits. Moreover, she emphasizes that the court returned Sibling to her care, and she currently is parenting him. *Id*.

The fundamental problem with this argument is that Mother is asking this Court to disregard our standard of review. Essentially, Mother urges this Court to reweigh the facts and emphasize the facts in her favor instead of the facts the trial court found to be persuasive. This we cannot do. In fact, our Supreme Court has explicitly instructed this Court not to "search the record for contrary conclusions or substitute [our] judgment for that of the trial court." *S.K.L.R.*, *supra* at 1124. Instead, we must "review the record for an abuse of discretion and for whether evidence supports [the] trial court's conclusions," particularly in cases involving close calls. *Id*.

In its explanation of its rationale for granting the petition, the trial court explicitly noted that it was a "tough case." N.T., 11/16/21, at 304. According to the court, T.W. and H.W. came into care due to housing instability, Mother's drug and alcohol issues, and Mother's rash decision to abscond to Syracuse, New York. *Id*. at 302. The trial court credited Mother with remedying her housing issues "for the most part," but found concerns with her mental health remained. *Id*.

The court observed that Mother still struggled with controlling her anger, as demonstrated in part by her arguing with the trial court during the hearing. *Id*. 302-03. The court indicated it was not terminating Mother's rights because of her arguments with the court, but because Mother's argumentative nature demonstrates her "inability to manage and navigate appropriately." *Id*. at 303. In the trial court's view, Mother does not appear to understand how her behavior contributed to T.W. and H.W.'s initial and continued placement in foster care. *Id*. at 304. The court emphasized Mother's testimony during the hearing wherein Mother indicated she did not understand why the court removed T.W. and H.W. from her care. *Id*.

The trial court acknowledged that Mother had a strong desire to parent T.W. and H.W., and sometimes, Mother controlled her mental health and "is completely rational" and "reasonable." *Id*. at 297-98. However, at other times, Mother took "a wide left." *Id*. at 298. The court credited Mother with visiting consistently and stated it did "not doubt [Mother's] love for [T.W. and H.W.], her care and concern for them, her willingness to parent them, [and] her desire to parent them." *Id*. Nevertheless, in the court's view, "what has been absent is her actual consistency, in accordance with the recommendations of the . . . parenting capacity evaluation, which was that she maintain a period of stability with her behavioral health, her mental health." *Id*.

The trial court offered this analysis:

I have been hearing this case since it came in for the adjudicatory [hearing in the dependency matter], August 22 of 2018. And for that entire time . . . there are times when [Mother] demonstrates as if she's moving towards being able to reunify, and then something happens and what appears again is incapacity, belligerence, anger, mental health issues that, despite her testimony – which I do take as true – that she's seeing a psychiatrist – what appears to be a psychiatrist, since it's monthly – and taking medication even with that, she . . . does not demonstrate the capacity to provide [T.W. or H.W.] with the essential parental care, control[,] or subsistence necessary for their physical or mental well-being.

Given that we've been going back and forth on this case since August 22, this [c]ourt has no reason to believe that, at any point in the near future, [M]other would be able to remedy what has caused these children to be without essential care, control[,] or subsistence necessary for their physical or mental well-being.

*Id*. at 300-01.

The trial court acknowledged Mother's argument regarding her ability to parent Sibling.[4] However, the trial court noted that it had "major concerns about [Sibling] remaining in [M]other's care, for the same reason that [H.W. and T.W.] have not ever returned home to [Mother]." N.T., 11/16/21, at 297. The court further explained as follows:

And I think [the] child advocate summed it up most appropriate, which is these children deserve stability. They are not the same age as the other children that [Mother] has in her care.

_____

[4] As our Supreme Court has recently held, "testimony in a termination case that a parent is competently caring for another child" may be relevant and the weight assigned to such evidence is within the discretion of the trial court. ***S.K.L.R.***, 256 A.3d at 1124 (overruling rule expressed in ***In re A.L.D.***, 797 A.2d 326, 338 (Pa.Super. 2002) that such evidence is *per se* irrelevant and inadmissible).

. . . .

> And so, these two kids, because of their young age, should not have to deal with that. They have continuously been in care, [H.W.] since she was five months old, [T.W.] since he was about 19 months old, maybe a little younger. . . . [T.W.] was one when his case first came before me. We are now . . . three years later, at the same place.

*Id*. at 301.

The certified record supports the trial court's findings and conclusions. As the assigned case manager, James Allen, explained during his testimony, Mother's fluctuating mental health and her substance abuse has been the main barrier to her reunification with T.W. and H.W. *Id*. at 140, 144.

DHS referred Mother to a provider who could assist her with mental health, domestic violence, and anger management at least five times, but she did not attend. N.T., 11/16/21, at 18-20. DHS referred Mother to Family School to assist in her parenting, but her mental health and poor judgment interfered with her ability to make progress there. According to Mr. Allen, the school discharged her for "noncompliance and aggression." *Id*. at 52. DHS also introduced a report from Family School, which indicates Mother began the program on February 9, 2019, but the school discharged her a month later based upon her repeated violations of the school's cell phone policy. *Id*. at DHS Exhibit 8. Instead of interacting with Sibling, T.W., and H.W., Mother accepted Father's calls from prison. *Id*. During her last session on March 9, 2019, Father accompanied Mother to the session without permission from the school or DHS, which presented a safety concern to the school. *Id*.

In August 2019, Mother underwent a dual diagnosis evaluation and received a diagnosis of cannabis use disorder, severe, and the recommendation to participate in an intensive outpatient program. *Id*. at DHS Exhibit 13. Mother began the intensive outpatient program. When she participated in a psychological evaluation in November 2019, the evaluating psychologist recommended that she complete her current intensive outpatient program and did not recommend any further treatment at that time. *Id*. at DHS Exhibit 18. However, in December 2019, the intensive outpatient program reported that Mother had attended only four sessions and missed 17 sessions. *Id*. Additionally, she had tested positive for substances for which she did not have a prescription. *Id*. Mother did not complete the intensive outpatient program. *See id*. at DHS Exhibit 20.

In January 2020, Mother participated in a court-ordered parenting capacity evaluation with Sheetal A. Duggal, Psy.D. *Id*. Mother reported that after she stopped the intensive outpatient program, she began attending mental health treatment twice a month with a different provider, who also prescribed her psychotropic medications. *See id*. Mother admitted to smoking marijuana regularly since she was fourteen years old. *Id*.

During the evaluation, Mother displayed poor insight into the reasons why her children were in foster care, her mental health, and her pattern of unstable housing. *Id*. Dr. Duggal believed Mother used substances to cope with symptoms of depression and diagnosed her with cannabis use disorder

and sedative hypnotic or anxiolytic use disorder. *Id*. Based upon Mother's endorsed mental health symptoms and presentation of manic behaviors during the evaluation, Dr. Duggal further diagnosed her with unspecified bipolar and related disorder. *Id*. She also noted further evaluations should consider whether personality factors were impacting her functioning, due to Mother's pattern of behavioral instability, "disregard and violation of others/rules/regulations," aggressiveness, and irresponsibility. *Id*.

According to Dr. Duggal, notwithstanding any treatment in which she had engaged, Mother's mental health and other struggles impacted her parenting. In Dr. Duggal's opinion,

[a]t this time due to lack of appropriate housing, insufficient income, ongoing substance use, noncompliance with objectives outlines, poor insight into her inappropriate patterns of behavior, ongoing inappropriate behaviors during supervised visits, denial of role, and shifting responsibility, [Mother] does not present with the capacity to provide for safety and permanency of her children.

*Id*.

Dr. Duggal outlined a variety of recommendations for the court to consider if it still wanted to pursue possible reunification of the family. *Id*. Dr. Duggal recommended that Mother participate in mental health treatment with a provider trained in cognitive behavioral therapy and demonstrate progress with at least six months of behavioral stability. *Id*. Furthermore, Dr. Duggal recommended that Mother participate in substance abuse treatment, abstain from using marijuana and benzodiazepines, engage in

domestic violence treatment, obtain housing, and identify a plan to increase her income. *Id*.

However, Mother was not able to gain or sustain the type of progress recommended by Dr. Duggal. *Id*. at 144. Case Manager Allen assessed Mother's overall compliance as being at a minimum level. *Id*. at 76. Although Mother completed a substance abuse program, she continued to test positive for marijuana and opioids afterwards and frequently did not attend screens. *Id*. at 59-60. Mother insisted she had a medical marijuana card, but never presented it to the drug screening office, despite the case manager's several requests that she do that. *Id*. at 68. Mr. Allen observed Mother appearing "[r]ather disconnected" while she is under the influence of substances, with failure to make eye contact and her eyes "shifting all over the place," not staying on topic of conversation, acting "very fidgety," and "moving around the room a lot." *Id*. at 69.

Mother was often substantially late to visits, showing up 45 minutes to one hour late for a two-hour visit. *Id*. at 69. In spring of 2021, CUA did not know Mother's whereabouts for a week and a half, and she missed her visits. *Id*. at 29. Mother initially lied to Mr. Allen, telling him that she was in an automobile accident, but she later admitted that she had been arrested and confined in jail. *Id*. at 29-32.

On another occasion, during a visit to Mother's house, Mr. Allen noticed Sibling and Mother were scratching their skin. *Id*. at 37. Mother blamed the

water in her home. *Id*. At Mr. Allen's urging, Mother took Sibling to the emergency room. *Id*. at 38. Medical professionals diagnosed Sibling with scabies and observed that Mother had an identical rash. *Id*. After a visit with Mother, T.W. and H.W. were infected with scabies, but Mother insisted it had to come from someone else. *Id*. at 38-39.

Mr. Allen credited Mother with trying to be involved with H.W.'s medical care but qualified that "she does it at her leisure." *Id*. at 39. For example, Mother attended H.W.'s surgery to remove her spleen and adenoids and stayed with her afterwards. *Id*. However, H.W. has gone to the emergency room several other times and Mother neglected to attend. *Id*. at 40.

Mother's engagement in erratic and odd behavior persisted until shortly before the hearing. For example, after CUA questioned Mother why her last drug screen results were inconclusive, Mother insisted it was because she was on her menstrual cycle. *Id*. at 64. Mother "abruptly jumped up, raised her dress up, and attempted to show [Mr. Allen] that she was still on her menstrual cycle." *Id*. at 65. Moreover, during August 2021, the trial court entered a PFA against Mother, ordering her to avoid contact with the foster parents of T.W. and H.W. because of her threatening behavior. *Id*. at 142-44.

After review, we conclude that the certified record supports the trial court's findings. We discern neither an abuse of discretion nor error of law in the trial court's determination that Mother's fluctuating mental health,

substance abuse, and concomitant unstable lifestyle created an incapacity that rendered her unable to parent T.W. and H.W. Further, given the amount of time T.W. and H.W. had been in foster care and Mother's inability to sustain any progress, the trial court was within its discretion to conclude Mother cannot remedy her incapacity with respect to T.W. and H.W. Accordingly, no relief is due on Mother's claim that the trial court erred and abused its discretion in finding grounds to terminate her parental rights.[5]

Mother's second issue presents a challenge to the trial court's dependency orders changing the permanency goal of T.W. and H.W. to adoption. We review decisions changing a placement goal for an abuse of discretion. *In re R.J.T.,* 9 A.3d 1179, 1190 (Pa. 2010). When considering a petition for a goal change for a dependent child, the trial court must determine the matters set forth at 42 Pa.C.S. § 6351(f) of the Juvenile Act. *In re S.B.*,

_____

[5] Notably, Mother waived any challenge to the trial court's determination pursuant to § 2511(b) that termination served the needs and welfare of T.W. and H.W. First, she did not challenge § 2511(b) in her concise statement. Moreover, in her brief, Mother claims the trial court did not make a "final determination . . . on the record" as to § 2511(b), and states § 2511(b) "will not therefore be addressed in this brief." Mother's brief at 11 (citing N.T., 11/16/11, at 304-06). Mother's decision to forego a challenge to § 2511(b) in her concise statement and brief waives any such challenge. *In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa.Super. 2017).

Even if Mother had preserved a challenge to § 2511(b), it would not garner relief because the trial court plainly addressed § 2511(b) and the certified record supports the trial court's determination that the termination of Mother's parental rights serves the needs and welfare of T.W. and H.W. *See* N.T., 11/16/11, at 304, 305-06.

943 A.2d 973, 978 (Pa.Super. 2008). In making these determinations, the best interests of the child, and not the interests of the parent, must guide the trial court. *In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011). In light of Mother's continued struggles with her mental health and instability in her own life, the sheer amount of time T.W. and H.W. have spent in foster care, and the need for T.W. and H.W. to achieve stability in their own lives, the court's decision to change their permanency goals was well within its discretion. Accordingly, we do not disturb it.

Based on the foregoing, we affirm the decrees terminating Mother's parental rights and affirm the orders changing the permanency goals to adoption.

Termination decrees and goal change orders affirmed.

Judge Stabile joins this Memorandum.

Judge McLaughlin concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2022

- 20 -